No. ——

First Circuit

---

DURAND v. RICHARD

---

(Jan. 7, 1927.  Opinion and Decree.)
(Feb. 12, 1927.  Rehearing Dismissed.)

---

(*Syllabus by the Editor.*)

1. Louisiana  Digest—Appeal—Par.  625; Fraudulent Conveyances—Par. 142.

The finding of the trial curt on a matter of fact, namely, that the sale of property was simulated and fraudulent, having been made for the purpose of despoiling the forced heirs of their legal rights, being clearly correct, is affirmed.

Appeal from the Parish of St. Landry. Hon. B. H. Pavy, Judge.

Action by Philomene Durand, wife, et als., against Valerie Richard, widow, et als.

There was judgment for plaintiff and defendant appealed.

Judgment affirmed.

Dubuisson, Perrault & Burleigh, of Opelousas, attorneys for plaintiff, appellee.

John W. Lewis, of Opelousas, attorney for defendant, appellant.

MOUTON, J.    Benjamin L. Durand was twice married; his first marriage was with Miss Angele Bienvenue and his second, with Miss Vallerie Richard. His first wife died about fifteeen years ago, his second wife survives him, Mr. Durand having died on Oct. 19, 1924. At the time of his death Mr. Durand was 72, and his wife 38. There were several children born of the first marriage and none of the second.

In April, 1923, Mr. Durand made a donation to Valerie Richard, his second wife, of several lots with a dwelling, situated in the village of Port Barre, including household furniture and movable effects, valued at $2500.00. In June, 1924, he made a sale of this property to Raymond Richard, his wife's brother, including the furniture, movable effects and one Fisher piano for $1600.00. His wife appeared in this act of sale renouncing her rights under the donation her husband had previously made to her of the property. In February, 1925, a few months after the death of Mr. Benjamin L. Durand, Raymond Richard executed a deed of the property, comprising

the movable effects and piano, to his sister, Mrs. Valerie Durand, for $1600.00. Several of the forced heirs of Mr. Durand instituted this suit, claiming that these sales from Mr. Durand to Raymond Richard and from Richard to Mrs. Durand after the death of her husband were pure simulations, and are asking for a partition of the property by licitation.

The district judge rendered judgment in favor of plaintiffs, decreeing that these sales were simulated. The question of simulation presents the vital issue in the case.

It is shown that not long after the execution of the act of donation in April, 1923, Mr. Durand and his wife became estranged, and were separated during a period of about eleven months. During this period of separation Mr. Durand went to live with his daughter, Mrs. Broussard, in Breaux Bridge. He instituted a suit for separation against his wife but a reconciliation having been effected between them, he returned to her sometime in May, 19924, at Port Barre, where he died later in October, 1924.

In the act of donation by Mr. Durand to his wife, he made the declaration that he had acquired the property since his second marriage, therefore the children of his first wife could not complain as he had "done all he could for them". The evidence shows that the furniture which Mr. Durand had included in this donation had been acquired during the existence of the first community, and had not been acquired after his second marriage, as was stated in the donation. Reference is made to this fact, as it shows that Mr. Durand was prompted by a desire to confer a benefit on his second wife, even to the extent of giving to her property which belonged exclusively to the first community. There was also with the furniture a Fisher piano, in the home of Mr. Durand at Port Barre where he had returned to live with his second wife as is hereinabove stated. The children wrote him that upon a certain day they would be in Port Barre to take away this piano which it is shown had been acquired during the existence of the first community, and had been donated by the first Mrs. Durand to one of her daughters, now a religious.

On the day appointed the daughters of Mr. Durand came over to Port Barre for the purpose of taking the piano. The son of one of his daughters who had accompanied them, broke into the house to remove the piano but the marshal of the town having intervened, the piano was not taken as had been intended. Mr. Durand and his wife were then absent, and were at that time on a visit at the home of Mrs. Durand's mother in Sunset. A message by telephone was sent Mr. Durand from Port Barre, stating that his children had broken into his house to remove the piano. Mr. Durand's wife, a sister and Raymond Richard, her brother, all say, they were on the gallery of their mother's home when this message was delivered, and that Mr. Durand immediately remarked that if he could sell his property at Port Barre he would be a happy man, as his children would then stop worrying or annoying him. Mr. Raymond Richard, his wife's brother, asked him how much he wanted for it; he answered $1600.00. The contract was then made for that price with the understanding that the parties would meet on the day following at Mr. Lewis' office in the city of Opelousas.

The next day, as agreed, the parties met at Mr. Lewis' office; Mr. Lewis was then absent; the sale passed by Mr. Lacombe, a notary public, in the office. The sale

was by authentic act, for $1600.00 cash; the money was counted, handed to the notary, and by him to Mr. Durand, the ostensible vendor. All the formalities of law usually accompanying genuine transactions of this character were carefully observed. Mrs. Durand appeared in the act for the purpose of renouncing her rights in the donation of the property which her husband had made to her. When Mr. Durand made this donation it is evident the object he had in view was to benefit his second wife to the detriment of the children of his first marriage.

His wife accepted the donation, and was unquestionably willing to get the property in derogation of the rights of the children, the forced heirs of her husband. She later, however, renounced her rights thereunder that her husband might effect the sale to her brother, Raymond Richard. Mr. Durand and his wife had evidently realized that these forced heirs could not be despoiled of their property rights by means of the donation inter vivos.

Mr. Durand, the day before he executed the sale, had serious trouble with his children as above explained, and no doubt for a stronger reason than existed before, desired that the property he had previously donated to his wife should remain hers to the exclusion of his heirs. When he was still smarting under the effects of the message he had received that his children were burglarizing his home at Port Barre, he executed the sale to his brother-in-law, Mr. Raymond Richard. In this sale he included the furniture and the piano, property of the first community, and of his daughter by gift from her mother. The purchaser named in the sale, Raymond Richard, is a bachelor, who was living in Sunset with his father and mother. He claims to have paid the $1600.00, price of the sale, with money

that belonged to him. It appears that he was employed as overseer of his father's plantation, and it is claimed that he is a man of frugal habits, that he had accumulated enough money from his earnings to make this investment. He claims that he had these $1600.00 in an iron box which was kept in his father's home. He says, he never deposits his money in banks, except such small sums as they may need for the current expenses of the plantation.

The proof is that there is a bank at Sunset, where he lives, and that his brother is a director of a bank in Opelousas, a town distant about 12 miles from Sunset. This may all be true about his aversions to banks, but it seems strange to us that a man should keep an amount of that importance in a small iron box, and would not rather entrust it to a bank for safekeeping. What is still more singular is the fact that this pretended iron box always remained unlocked. It is possible that such was the way Richard handled his funds but it is hard to believe that a man would be so careless with his money. Richard persists, however, in the statement that the money was his, and that the deal he made with his brother-in-law was a genuine transaction. He says, he bought the property for speculation. This sale was made in June, 1924, and Mr. Durand died in the following October, about four months thereafter. His wife qualified as administratrix of his estate. An inventory was made which amounted to $1144.00 which was made up of certificate of deposit in the Bank of St. Martinville with the accumulation of interest thereon. This stock certificate was dated Oct. 19, 1922.

His surviving wife, as widow in necessitous circumstances, qualified as administratrix of his estate, and in due course

of administration received from it the sum of $791.00.

On the 3rd of February, 1925, a few months after the death of Mr. Durand, Raymond Richard sold the same property with this furniture and piano to his sister, Mrs. Durand, for the sum of $1600.00, of which she paid him $750.00 in cash, and executed for the credit portion, nine promissory notes, the first for $50.00 and the rest of $100.00 each, all payable yearly with 8 per cent per annum interest, from date.

In the execution of this sale all the formalities of law were again scrupulously observed, the cash money being delivered to Raymond Richard, also the promissory notes. It may not be inappropriate to observe in connection with this sale that although Mr. Raymond Richard stated as a witness that he had bought the property originally for speculation, he nevertheless pretends to have sold it to his sister for the exact price he had paid for it, a little over one-third in cash, and the balance payable in small installments for a period of nine years. If he had really bought the property as a speculation it is not likely that he would have sold it to his sister for the same price, and on the conditions of his pretended transfer. It is a little singular also that Mr. Richard, a bachelor, should have invested his hard cash earnings in furniture and a piano, which was quite old and of small value, if any, as to the piano. The proof is that after the sale to Raymond Richard, Mr. Durand and his wife remained in possession of the property, including the movables, to the time of the former's death. The retention of possession by the vendor of an immovable property is always considered as a mark or badge of fraud. The citation of authority is hardly necessary to support this principle. C. C. 1921.

Mr. Richard explains, however, that upon making the sale he rented the property to Mr. Durand at $10.00 per month, and that his sister paid him these monthly dues usually on her visits to Sunset, where he was living, during the lifetime of Mr. Durand, and up to the time she claims to have acquired from Mr. Richard. The proof shows, and to which we have hereinabove referred, that Mr. Durand left at his demise a stock certificate in the Bank of St. Martinville amounting to $1100.00 which with accumulated interest footed up the sum of $1144.00. He was owner of this in 1922, as appears by the date of the certificate, which was two years prior to the time of the sale from Mr. Durand to Richard by which the defendants claim the former received $1600.00 in cash.

Mrs. F. O. Broussard, daughter of Mr. Durand, testifies that her father some four years prior to the time of his death was receiving as a retired railroad conductor the sum of $65.00 per month as a pension; also, that he was receiving per month, $40.00 from the Ben Overland Society, as to which statement there is no contradictory evidence. She also states that while her father lived with her in Breaux Bridge, which the record shows was for a period of 11 months, he was never in need, as his pension proved sufficient for all his wants. It may therefore be fairly inferred that he was a man of frugal habits, and that he did not require much to provide for his needs.

After he left the domicile of his daughter Mr. Durand returned to his wife at Port Barre. They had no children, and the expenses of the household could not have been very large. Not long after his return, in June, 1924, it is contended by defendants that he received these $1600.00. He died in October, 1924, only four months thereafter. The habits of Mr. Durand,

his age, his surrounding in a little village the size of Port Barre, make it impossible to believe that in this short period of 4 months, he could have squandered or dissipated this sum of $1600.00. The plaintiffs, who were in a way estranged from their father, could not possibly be called upon to make any explanation in reference to these funds. The only person who could have given satisfactory explanation in reference thereto, was Mr. Durand's surviving wife, one of the defendants in this case, and no other, as far as we can gather from the record. What became of this money is not accounted for and still remains a mystery.

In King Adm. vs. Atkins, et als., 33 A. 1057, the court used the following language:

"Simulation, from its nature, can usually be proved only by indirect and circumstantial evidence, and, when facts are shown which are sufficient to throw doubt upon the reality of the sale, the burden of proof is shifted to the parties who know the truth and can establish it by their testimony. When under such circumstances, they fail to furnish the evidence clearly within their power all the presumptions of law are against them."

It is true in the case cited above, that the parties claiming to have purchased, failed to testify to the variety of the sale, while in this case, Richard, the ostensible purchaser, claimed that he had paid the price, and that the sale was a genuine transaction.

In discussing the issue in that case, the court said in reference to the defendants therein, that the facts as to these transactions were necessarily known to them, "and may not have been known to any other person whatever." In this case, the fact as to what became of these $1600.00 was an outstanding fact. If it had been explained that this money had

been used by Mr. Durand as legitimate expenses or otherwise, there can be no question that his surviving wife could have explained in what way it had been expended. No one else was in a position to explain that. The proof showed that she had remained in possession of the property. This fact of corporeal possession on her part, taken in connection with the indirect and circumstantial evidence of this case, shifted the burden of proof upon her, and as a defendant, she should have offered all the evidence in her power to establish the verity of the sale. Unquestionably, if Mr. Durand had received this money as the price for his property, a man of his economical habits would have deposited this sum in some banking institution or would have invested it in some stock or other property. After his death it would have reappeared in kind; or in some form of investment. The fact that it did not reappear, shows that it found its way back to the ostensible vendee, who subsequently conveyed the property to Mrs. Durand in the form of an authentic sale.

It is true the forms of law were carefully observed in the sale to Mrs. Durand, but the fact that they were so observed is not to itself evidence of a genuine transaction, as the formalities required to give authenticity to contracts are sometimes minutely complied with to conceal the fraudulent purposes of those engaged in illegal transactions.

Counsel for defendants refers us to Monroe vs. Wartelle, 39 La. Ann. 1067, 3 So. 384, where the court said:

"The law does not favor actions by forced heirs to undo transactions of their ancestors as done in fraud of their rights; and, in which it was also stated that in the absence of convincing proof, and in the presence of evidence which merely cast a suspicion, the court will not take

the property of one man to give to another."

If the facts and circumstances above detailed had the effect of merely creating a suspicion affecting the reality of these transactions, we would not hesitate to dismiss the action of the plaintiffs. These facts and circumstances are of such a nature, however, that they are convincing and leave no doubt in our minds that the sales were simulations which had been carefully arranged to despoil the forced heirs of their just rights.

Having reached this conclusion, we hold that the district judge correctly held the sales were simulated, and recognized the ownership of the plaintiffs.